UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  11-40436-659 |
| | ) | In Proceedings under Chapter 11 |
| **R & G ENTERPRISES, LLC**, | ) | |
| | ) | Hon. Kathy A. Surratt-States |
| | ) | United States Bankruptcy Judge |
| | ) | |
| | ) | AFFIDAVIT OF RICHARD |
| | ) | ABEYTA, SR. IN SUPPORT OF |
| Debtor in Possession. | ) | FIRST DAY MOTIONS |

I, Richard Abeyta, Sr., state under penalty of perjury, states that the following facts are true, to the best of his information, knowledge and belief:

1.      I am the General Manager of R & G Enterprises, LLC, ("Debtor").  I have served in this position since 2006.

2.      In my capacity as General Manager of Debtor, I am familiar with Debtor's day-to-day operations, financial condition, business affairs and books and records, and I am authorized to submit this affidavit on behalf of Debtor.

3.      Debtor filed its Voluntary Chapter 11 Petition for Relief on January 18, 2011 ('the Petition Date").

4.      Debtor remains in possession of its real and personal property and Debtor continues to operate and manage its business as a Debtor in Possession pursuant to 11 U.S.C. §§ 1107 and 1108.

5.      Debtor has filed this Motion as an Emergency Motion for Expedited Hearing on Certain Motions and Application.

6.      Debtor manufactures tortillas and is the only tortilla factory in the St. Louis market, selling to restaurants and food distributors in the St. Louis metropolitan area.

7.      Contemporaneously with this Affidavit, Debtor has filed the following applications and motions (collectively, the "First Day Motions"):

   A.      Application of Debtor in Possession to Employ Edward J. Karfeld and Karfeld Law Firm, P.C. as its Counsel;

   B.      Motion to Use Existing Bank Account and Business Forms;

   C.      Motion for Order Authorizing Payment of Pre-Petition Wages, Salaries, Reimbursable Employee Expenses and Medical and Other Employee Benefits;

   D.      Motion for Order Determining Adequate Assurance for Payment for Future Utility Service;

   E.      Motion for Order Confirming Authority and/or Authorizing Debtor to Pay Various Federal, State and Local Taxes ;

   F.      Motion for Authority to Perform Obligations Necessary to Maintain Existing Insurance;

   G.      Motion Requesting Authorization and Direction to Banks and Other Financial Institutions to Receive, Process, Honor and Pay All Checks, Drafts or ACH Transfers Presented Pre-Petition or Post-Petition;

   H.      Motion for Order Authorizing Interim Use of Cash Collateral; Granting Adequate Protection and Providing Security to the Secured Tax Lien Creditors; and

   I.      Motion for Order Setting Deadline for Filing of Proofs of Claim.

8.      I am submitting this Affidavit in support of Debtor's First Day Motions. Capitalized terms not defined in this affidavit shall have the meaning ascribed to the term

in the relevant First Day Motion. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents and my opinion based upon my experience and knowledge of Debtor's operations and financial condition. If I were called upon to testify, I would testify consistently with the facts set forth in this Affidavit.

9.      This Affidavit affirms and incorporates facts that support the First Day Motions.

10.      Debtor believes that there are tax liens filed against it filed by the United States Department of the Treasury, Internal Revenue Service and the Missouri Department of Revenue ("the Secured Tax Lien Creditors"). As of the Petition Date, the aggregate balance owed to the Secured Tax Lien Creditors is approximately $65,000.00. The indebtedness of Debtor to the Secured Tax Creditors purports to be secured by liens on all of Debtor's assets.

11.      I have reviewed the First Day Motions and incorporate by reference the factual statements set forth therein. To the best of my knowledge, information and belief, the factual statements made in the First Day Motions are true and correct, and any documents attached as exhibits to the First Day Motions are true and correct copies of the documents they purport to be.

12.      The relief requested in the First Day Motions is necessary to enable Debtor to operate effectively and without loss of productivity. Furthermore, the relief requested in the First Day Motions will assist Debtor's efforts to effectuate its turnaround plan. Each of the First Day Motions is discussed below:

**A.** **Application of Debtor in Possession to Employ Edward J. Karfeld and Karfeld Lw Firm, P.C. as its Counsel**

13.     Debtor has selected Edward J. Karfeld and the law firm of Karfeld Law Firm, P.C., of which Mr.  Karfeld is a member ("the Firm"), to serve as its counsel in this Chapter 11 proceeding, under a general retainer as described below.  The Firm has considerable experience in matters under the U.S. Bankruptcy Code, and is well qualified to represent Debtor in this proceeding.

the Firm is expected to render services to Debtor including but not limited to the following:

(a)  To assist, advise and represent Debtor in the administration of this case;

(b) To assist, advise and represent Debtor in any investigation of the acts, conduct, assets, liabilities and financial condition of Debtor, the disposition of any assets of Debtor, and any other matters relevant to this case;

(c) To assist, advise and represent Debtor in the formulation, approval, and implementation of a plan of reorganization; and

(d)     To assist, advise and represent Debtor in the performance of all of its duties and powers under the Bankruptcy Code and the Bankruptcy Rules and in the performance of such other services as are in the interests of Debtor and its estate.

**B.** **Motion to Use Existing Bank Account and Business Forms**

14.   Debtor has maintained two checking accounts (an operating account and a payroll account) at Bank of America for several years. Prior to the Petition Date all funds which Debtor received were deposited in those accounts, and Debtor paid its bills, including payroll, through those account.

15.     In the ordinary course of its business, ACH transactions are also deposited

into the operating account on a daily basis. Debtor maintains current and accurate records of all ACH transactions.

16.     Debtor is opening two debtor in possession bank accounts at Bank of America, and will instruct its customers to direct their payments by electronic funds transfers to the operating account at Bank of America. Debtor has been advised by Bank of America that it will take one to two weeks to effectuate the change. It is necessary that Debtor maintain its existing operating account at Bank of America until the changes are made.

17.     In addition to its Bank Account, Debtor uses in the ordinary course of its business numerous business forms and records. To minimize expense to the estate and avoid disruption and confusion on the part of employees, customers and suppliers, Debtor has requested that the Court authorize it to continue to use all existing business forms and records (including but not limited to stationery, purchase orders and invoices), as such business forms and records were in existence immediately before the Petition Date, without reference to Debtor's status as debtor in possession; provided, however, that, upon depletion of Debtor's existing stock of business forms, Debtor will obtain new business forms reflecting its status as debtor in possession. With such authorization, Debtor will be able to avoid the expense and delay of ordering entirely new business forms. Debtor submits that no party in interest would be prejudiced in any way by this relief. Debtor has no desire to conceal the fact that it is in Chapter 11, and parties doing business with Debtor undoubtedly will be aware of Debtor's status as debtor in possession. Given these circumstances, changing business forms would be unnecessary and unduly burdensome.

**C.     Motion for Order Authorizing Payment of Pre-Petition Wages and**

**Salaries**

18.     Debtor employs 11 people.

19.     Debtor has the following employee obligations that have accrued prior to the Petition Date (collectively, the "Pre-Petition Employee Obligations"): Employee compensation, including wages and salaries.

20.     Seven (7) employees are paid hourly.  The other four (4)  are paid a salary.

21.     On January 17, 2011, Debtor distributed payroll checks to its employees in the ordinary course of business. The total amount of these payments, including federal, state and local tax obligations related thereto, was approximately $4,340.

22.     Debtor remains obligated to pay its employees for work completed before the Petition Date (the "Pre-Petition Payroll").  The estimated amount of the Pre-Petition Payroll, including federal, state and local tax obligations, for all employees is approximately $2,384.

A.     Debtor pays its hourly employees weekly, on Monday. There is a three day hold back of wages on debtor's hourly employees.   The next regular payroll disbursement for Debtor's hourly employees is scheduled to be made January 24, 2011 in the approximate amount of $4,340 covering the period of January 13, 2011, to January 19, 2011; of which about $1,284 is attributable to pre-petition earnings.

B.     Debtor pays its salaried employees weekly, on Monday.  There is a three day hold back of wages on Debtor's salaried employees.  The next regular payroll disbursement for Debtor's hourly employees is scheduled to be made January 24, 2011 in the approximate amount of $2,200 covering the period of January 13, 2011, to January 19, 2011;  of which about $1,100 is attributable to pre-petition earnings.

23.     Debtor uses Paychex, a payroll service, which calculates various deductions

from employees' paychecks, including payroll taxes and the employee portion of FICA and may have to deduct for legally-ordered deductions such as wage garnishments, child support and tax levies. Debtor then pays such amounts to the appropriate third parties. Due to the commencement of its Chapter 11 case, Debtor may not have remitted to the appropriate third parties amounts that would be deducted from employee paychecks prior to the Petition Date. Debtor has no estimate of the amount of these unremitted deductions at this time. Debtor seeks authority to forward the unremitted deductions to the appropriate third parties in the ordinary course of business.

24.     Debtor's inability to pay the outstanding Pre-Petition Employee Obligations will cause employees to endure significant stress, hardship and suffering. The effect of this disruption in employee morale will cause a ripple of fear to run throughout the enterprise. Many employees live from paycheck to paycheck and rely exclusively on receiving their full compensation to pay their daily living expenses.

25.     If the Pre-Petition Employee Obligations are not timely paid, Debtor will experience disruption of its business operations which, in turn, will impair its ability to successfully reorganize. Accordingly, the Court should authorize payment of the Pre-Petition Employee Obligations as requested in the motion.

D.      **Motion for Order Determining Adequate Assurance for Payment for Future Utility Service**

26.     In the ordinary course of their business, Debtor incurs expenses for electricity, gas, water and sewer services that are provided by approximately 5 utility providers (collectively, the "Utility Providers"). The Utility Providers are listed in the motion. The Utility Providers do not include parties that are obligated to provide services to Debtor pursuant

to the terms of a contract.

27.     On average, Debtor incurs expenses of approximately $7,775 per month for utilities: approximately $5,400 per month for gas, approximately $1,550 per month for electric, approximately $250 per month for water, approximately $225 per month for sewer, and approximately $350 per month for telephones, which amounts are paid by Debtor in the ordinary course of its business. Prior to the Petition Date, Debtor had a history of untimely payment of utility costs.  Debtor is currently past due on its electric, gas, and sewer bills.

28.     Based on revenues from post-petition business operations, Debtor expects to have ample liquidity to timely pay all post-petition obligations owed to the Utility Providers.  Debtor proposes to provide adequate protection to Utility Providers by making payments on utility bills each week, on Wednesday ("Adequate Protection"), as follows:

| *Utility Provider* | *Amount per week* |
|---|---|
| Ameren Missouri | $ 358 |
| AT & T | 81 |
| Missouri American Water | 58 |
| Metropolitan St. Louis Sewer District | 52 |
| Laclede Gas Company | 1,246 |
| Total weekly payments... | $1,795 |

29.     Debtor submits that this provides protection well in excess of that required to grant adequate assurance to the Utility Providers.

30.     In addition, Debtor proposes the following procedures (the "Utility Adequate Protection Procedures") under which a Utility Provider may make additional requests for

adequate assurance:

      A.    If a Utility Provider is not satisfied with the assurance of future payment provided by Debtor, the Utility Provider must serve a written request, within thirty (30) days following the date of entry of an order granting the Motion, setting forth the following (each, a "Request"): (I) the location(s) at which the utility services are provided, (ii) the account number(s) for such location(s), (iii) the outstanding balance for each account, (iv) a summary of Debtor's payment history on each account, and (v) the additional adequate assurance sought by the Utility Provider.

      B.    The Request must be served upon Debtor at R & G Enterprises, LLC, 11722 Northline Industrial Drive, Maryland Heights, MO 63043-3313, and upon Edward J. Karfeld, attorney for Debtor, at Karfeld Law Firm, PC, 611 Olive Street, Suite 1640, St. Louis, MO 63101-1711; or at such other address as Debtor notifies the Utility Provider in writing.

      C.    Without further order of the Court, Debtor may enter into an agreement granting additional adequate assurance to a Utility Provider serving a timely Request if Debtor in its discretion determines that it is reasonable to do so.

      D.    If Debtor believes that additional adequate assurance should not be provided to a Utility Provider that has served a timely Request, Debtor shall file a motion pursuant to Section 366(c) of the Bankruptcy Code, within thirty (30) days after the receipt of such Request, seeking a determination from the Court that the Utility Adequate Assurance, plus any additional consideration offered by Debtor, constitutes adequate assurance of payment. Until such time as the Court issues its ruling on such motion, the Utility Provider that is the subject of the motion may not alter, refuse or discontinue services

to Debtor or recover or set off against a pre-petition deposit.

E.      Any Utility Provider that fails to make a timely Request shall be deemed to be satisfied that the Utility Adequate Assurance provides adequate assurance of payment to such Utility Provider within the meaning of Section 366 of the Bankruptcy Code, and shall further be deemed to have waived any right to seek additional adequate assurance during the course of this Chapter 11 case.

31.     Debtor submits that the proposed Utility Adequate Protection and Adequate Assurance provides protection well in excess of that required to grant adequate assurance to the Utility Providers.

32.     Debtor, of course, has a powerful incentive to stay current on its utility obligations because of their reliance on utility services for the operation of their business. These factors, which the Court may and should consider when determining the amount of any adequate assurance payments, justify a finding that Debtor's proposed Utility Adequate Assurance is more than sufficient to assure the Utility Providers of future payment.

33.     Debtor's proposed Utility Adequate Protection and Adequate Protection Procedures are fair, reasonable and necessary in this Chapter 11 case. If they are not approved, Debtor could be forced to address requests by their Utility Providers in a disorganized manner during the critical first weeks of the case.  Moreover, Debtor could be blind sided if a Utility Provider unilaterally determines (after the thirtieth day following the Petition Date) that it is not adequately protected and, based on such unilateral determination, terminates service or makes an exorbitant demand for payment to continue service. The Utility Adequate Protection Procedures are designed to protect against such a circumstance.

**E.** **Motion for Order Confirming Authority and/or Authorizing Debtor to Pay Various Federal, State and Local Taxes**

34.     In the ordinary course of business, Debtor collects and remits withholding taxes and related obligations (collectively, the "Pre-Petition Taxes") owing to various federal, state and local governmental and regulatory entities (collectively, the "Taxing Authorities"). Pre-Petition Taxes consist of the following:

  A.     Withholding taxes and payroll related taxes;

  B.     Personal property taxes; and

  C.     Other Taxes Imposing Potential Personal Liability. Certain Taxing Authorities impose personal liability on directors and/or responsible officers for failure to pay certain types of taxes or assessments. Although, Debtors believe that all Pre-Petition Taxes for which Debtor's directors and/or responsible officers may be personally liable are described herein, it is possible that other such obligations may be discovered subsequent to the filing of this Affidavit. To the extent any other such obligations may be discovered subsequent to the filing of this Affidavit, Debtor considers them "Pre-Petition Taxes" as such term is defined and used in this Motion and requests authority to pay such obligations as they may arise in the ordinary course of Debtor's business.

35.     Further, Debtor uses banks and other financial institutions to receive, process, honor and pay any and all checks and all fund transfer requests presented for payment of Pre-Petition Taxes. Checks payable to the Taxing Authorities are drawn on select disbursement accounts and can be readily identified as relating to the authorized payment of Pre-Petition Taxes.

36.     Failure to pay the Pre-Petition Taxes may impact Debtor's ability to conduct

business in certain jurisdictions and its ability to perform its post-petition obligations. Debtor is required to pay other taxes and license fees to maintain its good standing and to maintain its assets free and clear of liens. If such obligations are not timely paid, Debtor will be required to expend time and incur legal fees to resolve a multitude of issues that will arise, including the defense of audits, the defense of lien actions and the potential revocation of licenses and other privileges. Debtor desires to avoid disputes with governmental units and the unnecessary expenditures of time and money resulting from such disputes. The payment of the Pre-Petition Taxes in the ordinary course will ensure that disputes are avoided and that Debtor's resources are not wasted.

F. **Motion fr Authority to Perform Obligations Necessary to Maintain Existing Insurance**

37. In the ordinary course of business, Debtor maintains the following insurance policies (collectively, the "Insurance Policies") through third-party insurance carriers (the "Insurance Carriers"):

| Type of Insurance | Carrier |
|---|---|
| Property, Business and Fire Insurance | Hanover Insurance Group |
| Workmen's Compensation Insurance | Missouri Employers Mutual |
| Business Automobile Insurance | American Family Insurance |

38. Pursuant to 11 U.S.C. §§ 105(a) and 363(b), Debtor seeks authorization to: (I) maintain and continue to make all post-petition payments (including post-petition fees and premiums), if any, with respect to the Insurance Policies on an uninterrupted basis; and (ii) maintain and continue on an uninterrupted basis, Debtor's pre-petition practices with respect to each policy or contract.

39.     Debtor must be permitted to maintain the Insurance Policies. If the Insurance Policies lapse Debtor may be exposed to substantial liability for damages or losses resulting to persons and property of Debtor and others.  The United States Trustee's Guidelines and applicable state law also require Debtor to maintain the Insurance Policies.

40.     If post-petition premium installment payments are not paid as they come due, the Insurance Carriers could seek relief from the automatic stay granted under 11 U.S.C. § 362(a), to terminate the Insurance Policies.  If the Insurance Carriers succeed in such a request, Debtor would be forced to seek replacement insurance coverage.  Even if Debtor was able to purchase replacement insurance coverage, it is doubtful that Debtor would be able to do so on terms and conditions as favorable at those presently in place under the current Insurance Policies.  Moreover, given the current circumstances, there is no assurance that Debtor would be able to obtain replacement insurance quickly enough to prevent a lapse in coverage.

41.     Debtor's insurance coverage is essential to its reorganization.  Any interruption in such coverage could expose Debtor to serious risks, including, but not limited to (I) direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers, (ii) material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers, (iii) the possible inability to obtain similar types and levels of insurance coverage, and (iv) higher costs for reestablishing any lapsed policies or obtaining new insurance coverage.

42.     Debtor believes that maintaining continued and uninterrupted insurance coverage under the favorable terms and conditions provided by the Insurance Carriers is clearly in the best interests of Debtor, its estate and its creditors.

**G.** **Motion Requesting Authorization and Direction to Banks and Other Financial Institutions to Receive, Process, Honor and Pay All Checks, Drafts or ACH Transfers Presented Pre-Petition or Post-Petition**

43.      Debtor has maintained two checking accounts (operating account and payroll account) at Bank of America for several years, from which it pays all of its bills, including payroll, taxes, utilities, rent and vendors.

44.      Pre-petition, Debtor wrote checks on these checking accounts.

45.      The majority of the checks that were written pre-petition were presented for payment and honored pre-petition.

46.      Several checks that were written pre-petition were not presented for payment pre-petition, including employees paychecks and payments to utilities and suppliers.

47.      It is estimated that on the Petition Date, there was outstanding ding approximately $4,340 for paychecks, and about $4,500 in checks to others, the largest of which is a check to a supplier for about $2,300.

48.      In order to avoid a disruption in the ordinary and usual business and financial affairs of Debtor and to insure as smooth of a transition into Chapter 11 as possible, it is essential that all banks and other financial institutions on which checks, drafts or automated clearing house ("ACH") transfers are drawn be authorized and directed to receive, process, honor and pay any and all such checks, drafts or ACH transfers, whether presented prior to or after the date of the filing of this Chapter 11 case, January 18, 2011.

49.      As of the date of the filing of the Chapter 11 case, Debtor had on deposit in excess of $6,000 in its operating account and almost $5,000 in its payroll account at Bank of America.

50.     The Internal Revenue Service and the Missouri Department of Revenue purport to have a lien on pre-bankruptcy assets and will have a lien on post-petition assets if the Court grants Debtor's Motion to Use Cash Collateral.

51.     It is in the best interest of Debtor, the creditors and all parties in interest for the Court to authorize and direct all banks and other financial institutions on which checks, drafts or automated clearing house ("ACH") transfers are drawn to receive, process, honor and pay any and all such checks, drafts or ACH transfers, whether presented pre-petition or post-petition.

**H.      Motion for Order Authorizing Interim Use of Cash Collateral; Granting Adequate Protection and Providing Security to the Secured Tax Lien Creditors**

52.     Debtor has an immediate need to use the Internal Revenue Service and the Missouri Department of Revenue's (the "Secured Tax Lien Creditors") cash collateral (as such term is defined in Section 363(a) of the Bankruptcy Code) to permit, among other things, (a) the orderly operation of Debtor's business, (b) the management and preservation of Debtor assets, (c) the maintenance of Debtor's business relationships with customers, vendors and contract parties, (d) the payment of payroll and other employee obligations, (e) the satisfaction of other operational needs, and (f) the maintenance of the going concern value of Debtor's business and the preservation of Debtor's estate. Without immediate access to cash collateral Debtor lacks sufficient liquidity to preserve and maintain the going concern value of the business and the estate's value will be irreparably harmed.

53.     In light of the circumstances, Debtor will engage in good faith discussions and arm's length negotiations with the Secured Tax Lien Creditors. As a result of these

discussions and negotiations, Debtor has reached an agreement with the Secured Tax Lien Creditors which will address Debtor's immediate need for cash.

54.     Debtor is negotiating with the Secured Tax Lien Creditors to reach an agreement with them regarding post-petition use of cash collateral.

55.      Debtor will require use of the Secured Tax Lien Creditor's collateral during the case.  Debtor projects that it will expend up to $60,000 of cash collateral through February 27, 2011, as set forth in the operating budget, Debtor will use the cash, inventory, and accounts that are or which may be subject to liens of the Secured Tax Lien Creditors.

56.     Debtor's universe of potential lenders is extremely limited. Given the existing liens on its assets, Debtor does not believe that it would be able to obtain necessary operating funds on an unsecured basis. Additionally, Debtor does not believe it would be able to obtain an alternative borrowing facility on terms and conditions as favorable as those proposed herein, both economically and from a timing perspective.

**I.     Motion for Order Setting Deadline for Filing of Proofs of Claim**

57.     Debtor believes that all creditors and parties in interest should be given ninety (90) days notice to file their Proofs of Claim.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.

Dated: January 19, 2011

        /s/ Richard Abeyta, Sr.
        Richard Abeyta, Sr.
        General Manager